Gregory L. Smith
Julie Stark (Of counsel)
THE LAW OFFICE OF GREGORY L. SMITH
157 13th Street
Brooklyn, New York 11215
Tel (718) 766-8128
gls@logls.com

*Attorneys for Plaintiff*
LIUBYM GERASYMENKO

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

LIUBYM GERASYMENKO,

                 Plaintiff,

     -against-

SYMBION POWER SERVICES U.S., INC.,
SYMBION POWER HOLDINGS LLC,
SYMBION POWER LLC, R.W. CHELSEA
HOLDINGS LTD, PAUL HINKS, RICHARD
NICHOLAS BETHELL a/k/a RICHARD
NICHOLAS THE LORD WESTBURY, R.W.
CHELSEA ENERGIE LTD f/k/a SYMBION
ENERGY HOLDINGS LTD and MYHYDRO
LLC,

                 Defendants.

-------------------------------------------------------X

**Case No. _____**


**COMPLAINT**

         Plaintiff Liubym Gerasymenko ("Gerasymenko" or "Plaintiff"), by his attorneys,

The Law Office of Gregory L. Smith, as and for his complaint against defendants Symbion

Power Services U.S. Inc. ("SPSUS"), Symbion Power Holdings LLC ("SPH"), Symbion Power

LLC ("SP"), R.W. Chelsea Holdings Ltd ("RWC"), Paul Hinks ("Hinks"), Richard Nicholas

Bethell (a/k/a Richard Nicholas the Lord Westbury) ("Westbury"), R.W. Chelsea Energie Ltd

(f/k/a/ Symbion Energy Holdings Ltd) ("SEH") and MyHydro LLC ("MyHydro") (collectively, "Defendants"), alleges, from personal knowledge as to himself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     This is an action for breach of contract and the New York Labor Law arising from Defendants' failure and refusal to pay wages and other benefits due and owing to Plaintiff, who served as Chief Financial Officer ("CFO") of defendant SPH and related companies, during the course of his employment with Defendants under a written employment contract executed in 2018 between Plaintiff and Defendants' agent, SPSUS, acting on behalf of itself and all other defendants, as well as a settlement agreement executed in November 2022 under which SPSUS was obligated to pay Plaintiff $450,000 as a condition of compromising his claims for unpaid wages and benefits against all Defendants (the "Settlement Agreement"). SPSUS made one payment of $60,000 to Plaintiff under the Settlement Agreement and then promptly defaulted. Pursuant to the explicit terms of the Settlement Agreement, Plaintiff, upon SPSUS's breach thereof, is now entitled to seek the full amount of unpaid wages and benefits purportedly compromised in the Settlement Agreement, including all liquidated damages as permitted by the New York Labor Law.

2.     Hinks and Westbury have over the years failed to pay salary and other compensation to dozens of workers employed in companies related to defendant SPH (SPH and its subsidiaries, collectively, "Symbion"), including without limitation defendants SPSUS, SPH and SP, and have explicitly threatened unpaid employees with never receiving back pay if they were to resign. Hinks and Westbury also threatened employees who resigned that, if they were to

sue, Symbion would counter-sue them on spurious allegations and force them to defend counterclaims at more expense than they would obtain by suing.

3.      Hinks and Westbury have treated the entities within Symbion, as well as defendants RWC, SEH and MyHydro, as interchangeable, moving funds, assets and personnel within and outside Symbion without consideration. Entities within Symbion, as well as defendant RWC, have routinely paid debts of other entities within Symbion, including wages and benefits payable by the various entities designated as the employees' nominal employer. When Symbion has settled with various employees and other creditors, the typical *modus operandi* has been to insist on serial payments, make the first payment and then default on the remaining settlement payments, forcing the counterparties to either forego payment altogether, wait unreasonable times for subsequent payments or sue.

4.      Hinks and Westbury's disregard for corporate formalities and the separate juridical existence of companies they own and control is open and notorious, including failing to register defendants SPH and SP as authorized to conduct business in New York while publicly touting them as "New York-based" companies, failing to file federal or state tax returns for defendants SPH and SP, moving funds, assets and employees freely from entity to entity within Symbion, paying employees from one entity within Symbion (or through defendant RWC) while they work for another entity and siphoning Symbion funds to pay expenses for family members and unrelated entities.

## PARTIES

5.      Plaintiff Gerasymenko is a natural person who is a national of Ukraine and a lawful permanent resident of the United States residing in the State of North Carolina. From November 1, 2018, to June 30, 2021, Gerasymenko was employed as Chief Financial Officer

("CFO") for Symbion in New York under a written contract of employment counter-signed by SPSUS for itself and as agent for all other companies comprising Symbion.

6.     Defendant SPSUS is a corporation organized under the laws of Delaware with its principal office located in this district in New York County. Defendant SPSUS executed the contract of employment with Plaintiff on behalf of itself and the other companies within Symbion. Defendant SPSUS is wholly owned by defendant SPH.

7.     Defendant SPH is a limited liability company organized under the laws of Delaware with its principal office located in this district in New York County. Defendant SPH is the sole owner of defendants SPSUS and SP. Upon information and belief, no member of defendant SPH resides in North Carolina.

8.     Defendant SP is a limited liability company organized under the laws of Delaware with its principal office located in this district in New York County. Defendant SP is the principal operating entity within Symbion and wholly owned by defendant SPH.

9.     Defendant RWC is a corporation organized under the laws of Cyprus with its principal offices located in Nicosia, Cyprus. At all relevant times, defendant RWC, through its shareholders, held a majority ownership interest in defendant SPH, and its principal beneficial owner, defendant Westbury, was a co-director, with defendant Hinks, of defendant SPH and other entities within Symbion.

10.     Defendant Hinks is a natural person residing in this district in New York County and at all relevant times held at least a 25 percent membership interest in defendant SPH and acted as co-director, with defendant Westbury, of defendant SPH and other entities within Symbion and was CEO of defendants SPSUS, SP and MyHydro and was co-director, with defendant Westbury, of defendant SEH.

4

11.     Defendant Westbury is a natural person who is a citizen of the United Kingdom residing in Cyprus. At all relevant times, defendant Westbury was the beneficial owner of a majority of membership interests in defendant SPH and acted as co-director, with Hinks, of defendant SPH and other entities within Symbion with the title of "chairman." Defendant Westbury also served as the sole director and majority shareholder of defendant SEH.

12.     Defendant SEH is a company organized under the laws of Cyprus with its principal office in Nicosia, Cyprus. Defendant SEH was formed by Hinks and Westbury as a "parallel" entity to Symbion to which Symbion fraudulently transferred its assets without fair consideration to shelter those assets from Symbion's creditors. Defendant SEH's shareholders are defendant Hinks and Sahoun Ltd., a company owned and controlled by defendant Westbury and a shareholder of defendant RWC.

13.     Defendant MyHydro is a limited liability company organized under the laws of Delaware with its principal offices located in this district in New York County. Hinks and Westbury formed MyHydro as a vehicle to pursue small-scale hydro-electric projects outside of Symbion to shelter those project assets from Symbion's creditors. As CFO of Symbion, Gerasymenko, along with other officers and employees of Symbion, was asked to and did provide services to defendant MyHydro while being employed by Symbion. Upon information and belief, no member of defendant MyHydro is a resident of North Carolina.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over defendants SPSUS, SPH, SP, Hinks and MyHydro pursuant to New York Civil Practice Law and Rules ("CPLR") section 301 because they reside or are domiciled in this district, have engaged in substantial business in the

State of New York, and have failed to perform acts required by the employment contract and New York Labor Law within the State of New York.

15.     This Court has personal jurisdiction over defendant Westbury pursuant to CPLR section 302(a)(1) because he served as co-director and chairman of defendants SPSUS, SPH and SP and supervised plaintiff Gerasymenko in his duties performed in New York as CFO of Symbion, participated in setting the terms and conditions of Plaintiff's employment with Symbion, participated in Plaintiff's hiring and firing and failed to perform acts required by the employment contract and New York Labor Law to be performed by him in this state.

16.     This Court has personal jurisdiction over defendant RWC pursuant to CPLR section 302(a)(1) because it controls Symbion, has commingled funds with Symbion, including paying the salaries of Symbion employees and other Symbion debts, has controlled Symbion's funds and is the *alter ego* of Symbion and Westbury.

17.     This Court has personal jurisdiction over defendant SEH pursuant to CPLR section 302(a)(1) because it is a *de facto* member of Symbion in that it received and exploited Symbion assets without providing fair value therefor in a scheme to defraud Symbion's creditors, including unpaid employees based in New York.

18.     This Court has subject-matter jurisdiction pursuant to 28 USC section 1332(a) in that it is a case between parties who are citizens of different states and in which citizens or subjects of a foreign state are additional parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     Venue is proper in this district pursuant to 28 USC section 1391 in that some defendants reside in this state and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## COMMON ALLEGATIONS

*Gerasymenko's Employment with Symbion*

20.     Gerasymenko is a seasoned international business and finance management executive, specializing in energy, mining, metals and consumer goods markets, with more than 25 years of experience in the field. Prior to starting to work for Symbion in 2015, he served in senior finance management roles at such companies as Philip Morris, Mondelez (formerly Kraft Foods), Metinvest (one of the world's largest mining and steel making conglomerates) and Invar International (an international energy projects developer) and received a Chartered Professional Qualification (FCCA) in Accounting, Audit, Financial Strategy and Management (U.K. equivalent of CPA), among other professional achievements.

21.     In 2015, Gerasymenko joined an SPH Cyprus subsidiary as CFO of the Independent Power Producer Division and was shortly transferred to Symbion's Dubai, U.A.E. office. In February 2017, at Symbion's insistence, he moved to New York to work in Symbion's New York office and, on November 1, 2018, entered into a new employment agreement with Symbion to serve as Symbion's CFO (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein by reference.

22.     When Gerasymenko was hired pursuant to the Employment Agreement, he was owed nearly six months of compensation that Symbion had failed to pay for his work in his prior positions. Symbion only paid that past-due amount in February 2019.

23.     Pursuant to the Employment Agreement, Gerasymenko was to be paid an annual salary of $247,200 (or $20,600 per month) plus a housing allowance of up to $5,500 per month, 30 days of paid vacation per year, reimbursement of business-related travel and other

expenses and additional benefits. Upon information and belief, Hinks and Westbury together made the decision to hire Gerasymenko as Symbion's CFO and set his compensation and other terms of employment.

24.     Gerasymenko performed well as CFO of Symbion. He was instrumental in deploying Symbion's new strategy aimed at the creation and development of a $1.1 billion multi-asset and multi-fuel independent power producer ("IPP") portfolio serving some of the most underserved communities; conducted comprehensive evaluation of new projects and oversaw ongoing development; set up regional teams; and, in his investor relations function, helped coordinate capital raise, helping attract more than $200 million in investment funds for Symbion.

25.     For the first few months of Gerasymenko's employment under the Employment Agreement, his salary, housing allowance and other remuneration were paid pursuant to the terms of the Employment Agreement.

26.     Beginning in or about October 2019, however, Symbion ceased paying Gerasymenko's housing allowance without warning or reason. Symbion also ceased reimbursing Gerasymenko's business-related expenses. At no time did Symbion challenge Gerasymenko's requests for reimbursement; it simply stopped paying for expenses incurred. Defendants did not tender a new employment agreement to Gerasymenko to reflect that he would no longer receive the monthly housing allowance or reimbursement for his business expenses.

27.     Beginning in or about February 2020, Symbion ceased paying Gerasymenko's monthly salary.

28.     Symbion is notorious for failing to pay contractors and employees their agreed-upon payments and wages, and Hinks and Westbury are notorious for lashing out and threatening employees who dare complain or indicate their intention to quit or sue. For instance,

Symbion's Tanzanian subsidiary failed to pay 43 workers their wages for over thirty months. Numerous employees employed through defendant SPSUS or a Cyprus subsidiary of defendant SPH have been cheated out of millions of dollars' worth of salary. Symbion has routinely counter-sued any employees who sue for unpaid salary to bury them in legal fees and force nominal settlements, a strategy that Hinks and Westbury have explicitly and routinely threatened against any employees demanding payment of missed salary and wages. This strategy has successfully cowed most unpaid employees and provided them with the stark choice to either continue to work without pay as the only hope of eventually securing unpaid salaries or to quit and abandon their claims for fear of protracted litigation.

29.     In Gerasymenko's case, Hinks and Westbury at first pleaded cash flow problems and continuously promised that Symbion would be receiving funds from power projects it operated in Africa (through Africa-based SPH subsidiaries) that would be used to catch up on missed salary and other payments, but those assurances were always false.

30.     As months dragged on without payment of current or past-due salaries, Hinks and Westbury shifted tactics. They began accusing employees who demanded payment of unpaid compensation, including Gerasymenko, of "disloyalty" and "mutiny." Indeed, Westbury, who at times used funds from RWC to pay salaries for key employees, made it clear that anyone who complained of missed salary payments was "disloyal" and would not be paid.

31.     In or about April 2020, Westbury purported to announce unilaterally that, beginning that month, all salaries of Symbion employees would be reduced by twenty percent. Neither Westbury nor any of the other Defendants tendered a new employment agreement to Gerasymenko to reflect this purported change in his salary.

32.     Gerasymenko rejected Westbury's proposed salary cut and insisted on payment of all salary and other amounts then in arrears. Hinks reiterated Symbion's "policy" that any employee who quit for failure to receive salary would have to sue and that Symbion would counter-sue, forcing the employee to accept pennies on the dollar to avoid massive legal bills.

33.     In response to Gerasymenko's insistence on being paid, Hinks and Westbury cut Gerasymenko out of the core tasks he was previously given to perform and refused to share information and communications concerning Symbion's finances and flow of funds. Nevertheless, Gerasymenko continued to work on high-level strategy, potential investments and ventures and mergers and acquisitions relating to Symbion companies and projects. Gerasymenko was also tasked with assisting with operations of defendant MyHydro, which was established by Hinks and Westbury explicitly to pursue small hydro-electric power projects outside the Symbion entities to protect those projects from Symbion's creditors. MyHydro was staffed by Symbion employees who were paid by Symbion for their work on MyHydro's behalf.

34.     On October 2, 2020, Hinks asked Gerasymenko about the status of his employment, and Gerasymenko unequivocally confirmed that he was still employed but would start the separation process if not paid. At that time, hoping that Symbion would shortly pay him as promised and seeing that Symbion had paid other employees who had failed to complain of unpaid wages, Gerasymenko continued his employment with Symbion.

35.     In January 2021, Hinks asked Gerasymenko to prepare an application for a PPP loan, promising that Gerasymenko would receive "any money" Symbion received from the PPP loan, and Gerasymenko began working on the application. However, shortly thereafter, Hinks transferred the PPP loan project to another employee, and no PPP loan was obtained.

36.     In February 2021, Hinks proposed a mutual separation in exchange for paying Gerasymenko some portion of the salary owed. However, the parties were not able to reach an agreement on amounts to be paid, and Symbion, through a letter from its counsel dated June 15, 2021, terminated Gerasymenko's employment without cause effective June 30, 2021. In the same letter, Symbion invited Gerasymenko to provide a demand for the amounts he believed were due.

37.     Following his termination, Gerasymenko applied for and was denied unemployment benefits based on the fact that, because Symbion had not paid him any salary since February 2020, his most recent income was zero, and thus he was not entitled to benefits for that reason. Upon information and belief, Gerasymenko missed out on at least $13,000 in unemployment benefits due to Symbion's failure to pay him wages due and owing.

38.     Despite Gerasymenko's "termination," Symbion continued to declare Gerasymenko as an employee to Symbion's group health insurer after June 2021 in order to maintain the minimum number of employees required to maintain a group health insurance plan. Symbion also continued to feature Gerasymenko on its website as Symbion's CFO until after the parties executed the settlement agreement described below.

*The Parties' Settlement and Symbion's Breach*

39.     On June 30, 2021, Gerasymenko made a demand for payment of $454,258 broken down as follows:

       (a)     $350,200 in unpaid salary for the period from February 2020 to and June 2021, inclusive;

       (b)     $71,100 in unpaid housing allowance for the period from October 2019 to June 2021, inclusive;

(c)     $32,371 in accrued, unused vacation time (33 days); and

(d)     $587 in incurred and claimed business-related expenses for the period from October 2019 to April 2021, inclusive.

40.     The parties eventually agreed on payment by Symbion of an amount of $450,000, to be paid in installments, in exchange for a waiver and release of all claims held by Gerasymenko against all Symbion-related entities and persons. Their agreement was memorialized in a settlement agreement effective on or about November 9, 2022 (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto as Exhibit B and incorporated herein by reference.

41.     Pursuant to the Settlement Agreement, Symbion was to pay Gerasymenko an initial gross payment of $60,000, with $10,200 of that to be paid to Gerasymenko's counsel and the remaining $49,800 to be paid to Gerasymenko less withholding of appropriate income and payroll taxes. Symbion was obligated to then pay three successive payments in a gross amount of $130,000 each, with $23,400 paid to Gerasymenko's counsel and the balance of $106,600, less appropriate withholding, to Gerasymenko 91, 181 and 271 calendar days, respectively, after the effective date of November 9, 2022.

42.     Gerasymenko provided Symbion with a completed form W-4 to permit Symbion to calculate appropriate withholding, and Symbion was obligated under the Settlement Agreement to pay all amounts withheld from his portion of the settlement amount to appropriate tax authorities and issue a form W-2 to Gerasymenko for payments made in 2022 and 2023, respectively.

43.     Symbion made the initial payment within the time provided in the Settlement Agreement, paying Gerasymenko's counsel $10,200 and paying Gerasymenko a net

total of $41,868.57, representing withholding of approximately 16 percent from the gross amount of $49,800. However, Symbion has never provided Gerasymenko with a form W-2, as required by the Settlement Agreement and U.S. law, despite repeated demands, and Gerasymenko learned from the Internal Revenue Service that Symbion has in fact not paid over to the IRS the $7,931.43 "withheld" from Gerasymenko's portion of the initial settlement payment. Symbion's failure to pay over amounts "withheld" constitutes a felony and exposes Gerasymenko to potential liability for the amounts Symbion has failed to pay over to appropriate tax authorities.

44.     Symbion requested additional time to make the second payment that was due 91 days after November 9, 2022, and the parties executed an amendment granting Symbion a one-time extension to February 28, 2023, to make the second payment in return for an additional payment of $5,000 to Gerasymenko to be added to the second payment, for a total gross one-time increased payment to Gerasymenko of $111,600, less appropriate withholding. With this amendment, the total settlement amount pursuant to the Settlement Agreement rose to $455,000. A true and correct copy of the amendment to the Settlement Agreement (the "Amendment") is attached hereto as Exhibit C and incorporated by reference herein.

45.     Symbion failed to make the second payment by February 28, 2023, as required by the Settlement Agreement and has still not paid any portion of the second payment or any payments thereafter and is thus in breach of the Settlement Agreement and Amendment.

46.     As stated explicitly in the Settlement Agreement, upon Symbion's breach, all waivers and releases of claims set forth therein are voided, and Gerasymenko is free to sue for and recover the full amount of any claims he may have compromised in the Settlement Agreement, less any amounts previously paid thereunder.

*The Corporate Defendants Are Alter Egos of Each Other and the*
*Individual Defendants Are Abusing the Privilege of the Corporate Shield*
*for their Personal Enrichment and to Avoid Creditors Including Plaintiff*

47.     Hinks and Westbury have run the Symbion entities as a unitary group,
completely disregarding the separate juridical existence of each of the entities within Symbion.
They move money among the Symbion entities at will to pay debts incurred by individual
entities, and in doing so, they commingle funds between entities without providing any
consideration or value for such transfers.

48.     All entities within Symbion share a common office in this district and
common ownership. Hinks and Westbury (through companies he owns and controls, including
defendant RWC) own defendant SPH, which in turn owns, directly or beneficially, all or the
controlling share of the other Symbion entities.

49.     All Symbion entities are also controlled by Hinks and Westbury, who are
co-directors of defendants SPH, SP and SPSUS, and have made all managerial and operational
decisions for the entire group of Symbion entities. Hinks and Westbury's own statements,
including statements made under oath in other litigation, admit that the Symbion entities are fully
intertwined and dependent on one another, and their operational needs, including financing,
corporate strategy, personnel management, lobbying and contract performance, are dominated by
defendants Hinks, Westbury and RWC, who have ignored all corporate formalities, issuing
decisions in their roles as co-directors of defendant SPH for all other Symbion subsidiaries.

50.     With respect to commingling of funds, defendant SP has received payment
directly from clients that have contracted with other subsidiaries of defendant SPH to provide
power-generation services, including from the U.S. Department of Defense and the public power
authority of Tanzania, and has used those funds as well as loan funds to pay unrelated debts

incurred by other, separate Symbion subsidiaries, including tax obligations, license and regulatory fees, employee salaries, goods and services contract obligations and attorney's fees. Defendant SPSUS earns no revenue and has been wholly dependent on millions of dollars in funding provided by defendant SP to pay employee salaries, rent and overhead while it provided back-office services for other Symbion entities, including defendant MyHydro, for power-generation projects in which defendant SP had no contract role, without any contribution from other Symbion entities for which SPSUS provided services.

51. Defendant SP has routinely represented itself as the principal Symbion entity undertaking and performing contracts that, in fact, are signed and ostensibly performed in the name of other Symbion entities.

52. Hinks and Westbury have also moved funds and assets at will into and out of Symbion from and to other, ostensibly unrelated entities and persons. As alleged below, Symbion has transferred assets to defendant SEH without receiving fair value in an explicit effort to shield Symbion assets from creditors, and defendant RWC has routinely paid salary and wages, including wage settlements, on behalf of Symbion entities.

53. Defendant SP has also paid over funds to relatives of Hinks and entities owned and controlled by Westbury in classic insider transactions that have served no legitimate corporate purpose. For instance, Symbion transferred £4,000 to Hinks's daughter in June 2017 and had earlier transferred her £10,000 to pay for her cosmetic surgery. In July 2017, Symbion transferred $30,000 to Hinks's wife. In February 2018, Hinks and Westbury caused Symbion to transfer €100,000 to Madagascar to fund their personal investments in La Maison de Marovasa-Be, a luxury resort on the northwest coast of Madagascar. These transfers occurred while Symbion was insisting it had no money to pay salaries.

54.     In 2017 and 2018, Symbion transferred over $1 million from money received from Highland Group, an outside investor in a Symbion power project at Lake Kivu, Rwanda, to pay down debts owed by an unrelated RWC subsidiary known as Napcap under a revolving line of credit issued by Greensill Capital; Westbury simply used the Highland Group's investment funds to pay the debts of an unrelated company of which he is the beneficial owner. In June and July 2020, Symbion's group health insurance coverage was on the verge of cancellation due to Symbion's failure to pay premiums (a regular occurrence), yet Hinks demanded his financial controller pay available funds to Hinks personally (for undisclosed reasons) instead of paying the overdue health insurance premium.

55.     Hinks and Westbury have acted in total disregard of corporate formalities, and, indeed, have failed even to cause defendants SPH and SP to prepare or file federal or state tax returns at any time or provide SPH members with any documentation of earnings or losses for purposes of completing their tax reporting obligations. Almost all decisions relating to the Symbion entities have been made by Hinks and Westbury on a wholly informal basis, without bothering to issue written resolutions, consents or other formal corporate action. Hinks and Westbury have also failed to cause defendants SPH and SP to obtain authorization to transact business in New York while publicly touting them as "New York-based" companies.

56.     Indeed, Hinks and Westbury have completely disregarded their obligations as statutory employers under New York Labor Law to pay salaries and wages on a timely basis to employees in New York. They have intentionally and routinely diverted funds off-shore to keep Symbion entities undercapitalized and insolvent in order to avoid paying employees, all while continuously falsely promising those employees that their salaries and wages would be

paid, and threatening those employees with ruinous litigation if they were to sue for payment of same.

57.     Hinks and Westbury control all of the corporate Defendants.  They have engaged in or directed these various acts of corporate malfeasance in order to personally enrich themselves and to avoid creditors, including Plaintiff. Hinks and Westbury are abusing the privilege of the corporate shield by making their various companies "judgment-proof" from liability for unpaid wages to their employees, thereby allowing them to have access to corporate capital for whatever they desire, including their personal needs.

58.     Westbury, especially, has used his near-total control over Symbion funds to avoid paying employee salaries and wages. Westbury and his right hand, an RWC officer with no title or role in any Symbion entity, exercised sole signatory authority over Symbion accounts, and Westbury's explicit authorization was required for *any* payments made by Symbion for any purpose. Westbury routinely failed and refused to permit Symbion to pay employee salaries while directing payment of Symbion funds to RWC or its subsidiaries.

*Fraudulent Transfer of Assets to Defendant SEH*

59.     In or about May 2016, Hinks and Westbury, having "managed" Symbion into insolvency and overwhelming debt, announced to defendant SPH's members their intention to continue Symbion's operations under a separate, parallel company outside Symbion to be formed in Cyprus that would receive Symbion's assets and corporate opportunities (on-going power projects owned and operated by SPH subsidiaries as well as future potential projects that were corporate opportunities of Symbion).

60.     In complete violation of SPH's operating agreement, including, without limitation, provisions requiring the consent of all SPH members for any transfer of Symbion

assets to affiliated persons, Hinks and Westbury formed defendant SEH in Cyprus in June 2016

for the explicit purpose of receiving and continuing to operate Symbion assets while leaving

Symbion stripped of assets and saddled with overwhelming debt, including outstanding unpaid

salary and wage obligations to current and former Symbion employees.

61.    In their May 2016 announcement to SPH members, Hinks and Westbury

stated that "the majority Shareholding group (RWC) of Symbion Power Holdings LLC has

decided it can not [sic] sustain further investment into [SPH]" given Symbion's outstanding

debts and that SEH was being formed to pursue power projects outside Symbion. The

announcement demanded substantial cash contributions from all members if they wished to

participate in the new, parallel venture or lose their ownership interest in those projects. Two

minority members eventually sued Hinks, Westbury, SPH, SP and others in Delaware Chancery

Court over this freeze-out scheme and thereafter settled their claims with Symbion.

62.    Hinks, especially, had concerns about the legality of the scheme to transfer

assets to SEH and asked a New York lawyer who regularly performed legal work for Symbion

for an opinion letter concerning the proposed transactions. That initial opinion letter was

delivered to Hinks and Westbury in or about October 2017. The lawyer opined that the transfers

of Symbion assets to SEH violated SPH's operating agreement and were likely fraudulent under

New York and Delaware law.

63.    Westbury informed the lawyer, who was a so-called "contract partner" at

his law firm, that if Symbion were forced to abandon the transaction, it would file for

bankruptcy, and the over $1 million in legal fees owed to the partner's law firm would never be

paid. The implication of this message was that the lawyer's income and employment with the

firm would be placed in jeopardy. The lawyer then reversed himself and delivered a second opinion letter shortly thereafter that blessed the transaction.

64.     Members of the law firm's management committee learned of the lawyer's reversal of his advice in the second opinion letter, conducted an internal review and notified Hinks and Westbury that the second opinion letter blessing the transaction was withdrawn and could not be relied on due to the obvious conflict in which the partner found himself when he produced the second opinion letter.

65.     Accordingly, Hinks and Westbury were twice put on actual notice that their scheme to transfer assets from Symbion to SEH was of dubious legality and most likely constituted fraudulent transfers.

66.     Nevertheless, Hinks and Westbury forged ahead and transferred numerous Symbion projects to SEH in return for the alleged forgiveness of sham, *ultra vires* debts Symbion purportedly owed to Westbury, RWC and related entities. An "umbrella agreement" consummating these transfers was executed by, among others, defendants SPH, SP, SPSUS and RWC in or about November 2018.

67.     Gerasymenko was asked to assist on the "umbrella agreement" and found that the assignment of "value" purportedly given to Symbion in exchange for the transfer of assets to SEH under the "umbrella agreement" was arbitrary and illusory. Symbion's minority members later alleged that many supposed "debts" to RWC and other entities related to Westbury were unauthorized under SPH's operating agreement, undocumented and, in some cases, double-counted for purposes of the transaction with SEH. Gerasymenko observed that no independent valuation of Symbion assets transferred to SEH had been conducted, and Hinks and

Westbury simply assigned whatever values were needed to match the purported value of debts to RWC and others that were intended to be discharged in the "umbrella agreement."

68.     Upon formation, defendant SEH's sole shareholder was Sahoun Ltd., a corporation owned and controlled by Westbury and a shareholder of defendant RWC. Hinks at first was hesitant to acquire an ownership stake in defendant SEH due to his concerns that the transfer of assets from Symbion to SEH constituted fraudulent transfers, which he admitted to Gerasymenko on several occasions. Nevertheless, in or about October 2017, Hinks acquired 18 percent of SEH's outstanding shares. In or about April 2019, Hinks's shareholding in defendant SEH increased to 27 percent. Westbury is currently the sole director of defendant SEH.

**69.**     At the time of the transfer of Symbion assets to defendant SEH, Symbion was insolvent (as Symbion has admitted in numerous litigations), it owed millions of dollars to contractors, vendors and employees, and it entered into the transaction with SEH for the express purpose of shielding Symbion's assets from creditors, including unpaid employees, and Symbion did not receive fair value in exchange for the Symbion assets transferred to defendant SEH.

## CAUSES OF ACTION

*First Cause of Action*
*Breach of the Employment Agreement*
*(against all Defendants)*

70.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

71.     Plaintiff and Defendants entered into the Employment Agreement on or about November 1, 2018.

72.     Plaintiff duly performed all of his job responsibilities pursuant to the Employment Agreement.

73.     At no time was Plaintiff told that his performance was not meeting Defendants' expectations.

74.     In or around October 2019, Defendants ceased paying Plaintiff's housing allowance and business expense reimbursements as provided for in the Employment Agreement. Defendants did not give Plaintiff notice of this change to the terms of his employment, Defendants did not provide Plaintiff an explanation for their actions, and the Parties never acknowledged and agreed, in writing or otherwise, to any changes to the terms of the Employment Agreement. Indeed, Hinks repeatedly assured Plaintiff that his unpaid housing allowance and expenses would be paid.

75.     In or about February 2020, Defendants ceased paying Plaintiff's monthly salary although Plaintiff continued to work for Defendants.

76.     Defendants terminated Plaintiff's employment without cause effective June 30, 2021.

77.     Defendants failed to pay Plaintiff's past due wages after termination.

78.     Accordingly, Defendants are in breach of the Employment Agreement.

79.     As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but no less than $457,789.43 in unpaid wages, plus prejudgment interest, taxable disbursements, costs and expenses.

*Second Cause of Action*
*Breach of the Settlement Agreement and Amendment*
*(against all Defendants)*

80.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

81.     Plaintiff and Defendants executed a Settlement Agreement effective on or about November 9, 2022.

82.     The Settlement Agreement provided that Defendants would pay Plaintiff a total of $450,000 to be paid in installments and further allocated as detailed therein.

83.     On or about November 8, 2022, Defendants paid Plaintiff the first installment of $ 52,068.57in past due wages.

84.     On or about February 10, 2023, Plaintiff and Defendants executed the Amendment to the Settlement Agreement, which extended Defendants' time to make the second installment payment to Plaintiff.

85.     As consideration for the Amendment, Defendants agreed to increase the total amount payable under the Settlement Agreement to Plaintiff to $455,000.

86.     Plaintiff has fully performed his obligations pursuant to the Settlement Agreement and the Amendment.

87.     Defendants have made no further payments to Plaintiff pursuant to the Settlement Agreement, as amended.

88.     Accordingly, Defendants are in breach of the Settlement Agreement, as amended.

89.     As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but no less than $402,931.43, plus prejudgment interest, attorney's fees, taxable disbursements, costs and expenses.

*Third Cause of Action*
*Violation of N.Y. Labor Law sections 193, 198(3) and 198(1-a)*
*(against all Defendants)*

90.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

91.     From in or about November 2018 to June 2021, Plaintiff was employed for hire by Defendants pursuant to the terms of the Employment Agreement.

92.     Pursuant to the Employment Agreement, Defendants had an obligation to pay Plaintiff his agreed salary, housing allowance, vacation pay and expense reimbursement, which constitute "wages" pursuant to the New York Labor Law.

93.     Defendants had and have no good-faith basis to refuse to pay Plaintiff the wages due and owing pursuant to the Employment Agreement, which total $457,789.43.

94.     Plaintiff was damaged by Defendants' failure to pay wages due and owing, which failure constitutes a violation of the New York Labor Law, including, without limitation, sections 193, 198(3) and 198(1-a) thereof.

95.     Pursuant to New York Labor Law section 198(1-a), Defendants are liable to Plaintiff for the full amount of the unpaid wages, plus an additional amount equal to one-hundred percent of the amount of the unpaid wages as statutory liquidated damages, for a total of $915,578.86, plus prejudgment interest, attorney's fees, taxable disbursements, costs and expenses, and Plaintiff is entitled to a judgment therefor.

*Fourth Cause of Action*
*Violation of N.Y. Labor Law section 215*
*(against all Defendants)*

96.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

97.     In retaliation for Plaintiff's complaints concerning Defendants' failure to pay Plaintiff's wages, Defendants reduced Plaintiff's work duties and cut him out of internal meetings and communications necessary for him to perform many of his core job functions.

98.     In retaliation for Plaintiff's complaints concerning Defendants' failure to pay Plaintiff's wages, Defendants prioritized paying other employees who failed to complain of unpaid wages and refused to pay Plaintiff to single him out for punishment for complaining about unpaid wages.

99.     Defendants eventually terminated Plaintiff's employment in retaliation for Plaintiff's repeated complaints concerning Defendants' failure to pay Plaintiff's wages.

100.     As such, Defendants have committed three separate violations of NYLL section 215-2(a).

101.     Accordingly, Defendants are liable to Plaintiff for liquidated damages pursuant to NYLL section 215-2(a) in an amount to be determined at trial but not more than $60,000.

*Fifth Cause of Action*
*Unjust Enrichment*
*(against all Defendants except SPSUS)*

102.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

103.     To the extent Defendants other than defendant SPSUS contend that only defendant SPSUS owed contract duties to, or employed, Plaintiff, Plaintiff is entitled to a judgment against each of the other Defendants for the fair market value of the work performed on their behalf for which Plaintiff has received no compensation.

104.     Plaintiff performed services for each of the other Defendants in good faith with an expectation, based on continuous representations by Hinks on behalf of the other Defendants, of compensation.

105.     Each of the other Defendants accepted Plaintiff's services and assured Plaintiff that he would be paid for rendering such services.

106.     The reasonable value of Plaintiff's services for the other Defendants was no less than $454,258, and Plaintiff is entitled to a judgment for no less than that amount, plus prejudgment interest, disbursements, costs and expenses.

*Sixth Cause of Action*
*N.Y. Debtor & Creditor Law section 273 (2019)*
*(against all Defendants)*

107.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

108.     As alleged above, all of the corporate Defendants are *alter egos* of each other, and the individual Defendants exercise complete dominion and control over all of the corporate Defendants and intentionally direct the malfeasance of the corporate Defendants with the express intent of rendering various companies judgment-proof and to enrich themselves personally.

109.     In or around November 2018, under the direction of the individual Defendants, SPH transferred a significant amount of its assets to SEH without receiving fair or equivalent value in exchange.

110.     Prior to the transfer, all Defendants were put on notice that the transaction was likely a fraudulent transfer pursuant to Delaware and New York law.  Accordingly, Defendants acted in bad faith by making the transfer.

111.    All corporate and individual Defendants directed and/or participated in the fraudulent transfer, were transferees of the assets, beneficiaries of the conveyance, and/or otherwise benefitted from the transaction.  By reason of the foregoing, Plaintiff has claims against all of the Defendants.

112.    Accordingly, the transfer of assets from SPH to SEH should be set aside, annulled and protected, or disregarded, attached and levied upon to the extent needed to satisfy any judgment rendered herein.

*Seventh Cause of Action*
*N.Y. Debtor & Creditor Law section 275 (2019)*
*Conveyances by a Person About to Incur Debts*
*(against all Defendants)*

113.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

114.    As alleged above, all of the corporate Defendants are *alter egos* of each other, and the individual Defendants exercise complete dominion and control over all of the corporate Defendants and intentionally direct the malfeasance of the corporate Defendants with the express intent of rendering various companies judgment-proof and to enrich themselves personally.

115.    In or around November 2018, under the direction of the individual Defendants, SPH transferred a significant amount of its assets to SEH in order to hinder, delay and defraud SPH's present and future creditors, including employees and former employees who were owed unpaid wages.

116.    Prior to the transfer, all Defendants were put on notice that the transaction was likely a fraudulent transfer pursuant to Delaware and New York law.  Accordingly, Defendants knew or should have known that the transfer was fraudulent.

117.    All corporate and individual Defendants directed and/or participated in the fraudulent transfer, were transferees of the assets, beneficiaries of the conveyance, and/or otherwise benefitted from the transaction.  By reason of the foregoing, Plaintiff has claims against all of the Defendants.

118.    Accordingly, the transfer of assets from SPH to SEH should be set aside, annulled and protected, or disregarded, attached and levied upon to the extent needed to satisfy any judgment rendered herein.

*Eighth Cause of Action*
*N.Y. Debtor & Creditor Law section 276 (2019)*
*Conveyances Made with Intent to Defraud*
*(against all Defendants)*

119.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

120.    As alleged above, all of the corporate Defendants are *alter egos* of each other, and the individual Defendants exercise complete dominion and control over all of the corporate Defendants and intentionally direct the malfeasance of the corporate Defendants with the express intent of rendering various companies judgment-proof and to enrich themselves personally.

121.    In or around November 2018, under the direction of the individual Defendants, SPH transferred a significant amount of its assets to SEH with the actual intent to render SPH insolvent, in order to hinder, delay and defraud SPH's present and future creditors, including current and former employees who were owed unpaid wages.

122.    Prior to the transfer, all Defendants were put on notice that the transaction was likely a fraudulent transfer pursuant to New York law.  Accordingly, Defendants acted with intent to commit a fraudulent transfer.

123.    All the corporate and individual Defendants directed and/or participated in the fraudulent transfer, were transferees of the assets, beneficiaries of the conveyance, and/or otherwise benefitted from the transaction.  By reason of the foregoing, Plaintiff has claims against all of the Defendants.

124.    Accordingly, the transfer of assets from SPH to SEH should be set aside, annulled and protected, or disregarded, attached and levied upon to the extent needed to satisfy the judgment rendered herein including attorneys' fees.

*Ninth Cause of Action*
*Injunctive Relief*
*(against all Defendants)*

125.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

126.    This Court should issue a preliminary injunction against all of the Defendants directing them to (a) pay over to the Internal Revenue Service and relevant state tax authorities the monies "withheld" from the first settlement payment to Plaintiff, (b) demonstrate proof of such payment to the satisfaction of the Court and (c) submit to the Internal Revenue Service and relevant state tax authorities a duly completed form W-2 (or equivalent state form) for the 2022 tax year showing amounts Symbion paid to Plaintiff in 2022 pursuant to the Settlement Agreement and amounts withheld for the payment of income and payroll tax obligations.

127.    Plaintiff is likely to succeed on the merits of his claims against all Defendants, and all of the equities favor Plaintiff. Defendants had an absolute legal obligation to pay over funds withheld from Plaintiff's settlement payment to the Internal Revenue Service and

relevant state tax authorities, and Defendants' failure to pay over such amounts constitutes criminal fraud. Defendants have no possible excuse for failing to pay over withheld amounts.

*Tenth Cause of Action*
*Intentional Interference with Prospective Economic Advantage*
*(against all Defendants)*

128.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and incorporate them herein by reference.

129.    Defendants' failure to pay Plaintiff his agreed salary and wages resulted in Plaintiff having no reportable income from in and after February 2020 to and including June 2021.

130.    Upon Defendants' termination of Plaintiff's employment effective the last day of June 2021, Plaintiff was entitled to and sought unemployment benefits. However, due to Plaintiff's lack of reportable income from and after February 2020, he was not able to establish prior wage income, a condition to receive unemployment benefits.

131.    Defendants' failure to pay Plaintiff his wages due and owing was intentional, unlawful, wrongful and without justification, and it resulted in preventing Plaintiff from obtaining payment of benefits for which he would have otherwise qualified.

Upon information and belief, Plaintiff was deprived of no less than $25,000 in unemployment benefits he would have received if Defendants had paid Plaintiff his earned wages in part or in full, and he is entitled to a judgment for no less than that amount, plus prejudgment interest, taxable disbursements, costs and expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on his causes of action as follows:

(a)     on the first cause of action, for compensatory damages against all Defendants in an amount no less than $457,789.43, plus prejudgment interest, taxable disbursements, costs and expenses;

(b)     on the second cause of action, for compensatory damages against all Defendants in an amount no less than $402,931.43, plus prejudgment interest, attorney's fees, taxable disbursements, costs and expenses;

(c)     on the third cause of action, for statutory damages against all Defendants in an amount no less $915,578.86, plus prejudgment interest, attorney's fees, taxable disbursements, costs and expenses;

(d)     on the fourth cause of action, for statutory damages against all Defendants in an amount no less $60,000;

(e)     on the fifth cause of action, for compensatory damages against all Defendants in an amount no less than $454,258, plus prejudgment interest, taxable disbursements, costs and expenses;

(f)     on the sixth cause of action, for equitable relief against all Defendants to set aside, annul and protect or disregard, attach and levy upon the assets wrongfully transferred to the extent needed to satisfy any judgment rendered herein, plus attorney's fees;

(g)     on the seventh cause of action, for equitable relief against all Defendants to set aside, annul and protect or disregard, attach and levy upon the assets wrongfully transferred to the extent needed to satisfy any judgment rendered herein, plus attorney's fees;

(h)     on the eighth cause of action, for equitable relief against all Defendants to set aside, annul and protect or disregard, attach and levy upon the assets wrongfully transferred to the extent needed to satisfy any judgment rendered herein, plus attorney's fees;

(i)     on the ninth cause of action, for injunctive relief against all Defendants

ordering them to pay to the IRS and all other state or local taxing authorities all payroll taxes and

other withholdings for and on behalf of Plaintiff that are due and owing and to issue appropriate

tax reporting forms to Plaintiff as required by law;

(j)     on the tenth cause of action, for compensatory damages against all

Defendants in an amount no less than $25,000; and

(k)     such other and further relief as the Court may deem just and proper.

Dated: June 30, 2023                    THE LAW OFFICE OF GREGORY L. SMITH
        Brooklyn, New York


                                        By: _____ */s/Gregory L. Smith*_____
                                                Gregory L. Smith
                                                Julie Stark (Of counsel)

                                        157 13th Street
                                        Brooklyn, New York 11215
                                        Tel (718) 766-8128
                                        gls@logls.com

                                        *Attorneys for Plaintiff*
                                        LIUBYM GERASYMENKO